**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **REDWOOD TECHNOLOGIES, LLC,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **JURY TRIAL DEMANDED** |
| **NXP SEMICONDUCTORS N.V., NXP B.V., AND NXP USA, INC.,** | § § § | **C.A. NO. 6:24-cv-127** |
| **Defendants.** | § § | |

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Redwood Technologies, LLC ("Redwood") files this Complaint against Defendants NXP Semiconductors N.V., NXP B.V., and NXP USA, Inc. (collectively, "NXP" or "Defendants") for infringement of U.S. Patent No. 7,664,130 (the "'130 patent"), U.S. Patent No. 7,917,102 (the "'102 patent"), U.S. Patent No. 7,688,901 (the "'901 patent"), U.S. Patent No. 7,974,371 (the "'371 patent"), U.S. Patent No. 8,155,224 (the "'224 patent"), U.S. Patent No. 8,744,005 (the "'005 patent"), U.S. Patent No. 8,873,517 (the "'517 patent"), and U.S. Patent No. 9,628,300 (the "'300 patent"), collectively, the "Asserted Patents."

**THE PARTIES**

1.      Redwood Technologies, LLC is a Texas limited liability company, with a principal place of business at 812 West McDermott Dr. #1038, Allen, TX 75013.

2.      On information and belief, NXP Semiconductors N.V. ("NXP NV") is a company organized and existing under the laws of the Netherlands, having a place of business at High Tech Campus 60, 5656 AG, Eindhoven, the Netherlands.

1

3.     On information and belief, NXP B.V. ("NXP BV") is a company organized and existing under the laws of the Netherlands, having a place of business at High Tech Campus 60, 5656 AG Eindhoven, the Netherlands. NXP BV is a wholly-owned and wholly-controlled subsidiary of NXP Semiconductors NV.

4.     On information and belief, NXP USA, Inc. ("NXP USA") is a corporation organized under the laws of Delaware. On information and belief, NXP USA is a wholly-owned and wholly-controlled subsidiary of NXP Semiconductors NV. NXP USA, Inc. has places of business in this District, including its U.S. Corporate Headquarters located at 6501 W. William Cannon Dr., Austin, TX 78735; and 3501 Ed Bluestein Blvd., Austin, TX 78721.

5.     Defendants are engaged (including, as relevant, in the past) in making, using, selling, offering for sale, and/or importing, and/or inducing one another and their respective subsidiaries, affiliates, distributors, suppliers, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, the following products accused of infringement (the "Accused Products"):

- NXP devices that are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax and/or IEEE 802.11s, as well as, their components (*e.g.*, hardware, software, and/or firmware), and processes related to the same (collectively, "NXP Wi-Fi compliant devices"); and

- Products comprising NXP Wi-Fi compliant devices.

6.     On information and belief, NXP NV and NXP BV maintain (and have maintained) a corporate presence in the United States via at least its U.S.-based sales and/or distribution subsidiaries and/or agents, including NXP USA.

7.      On information and belief, NXP NV controls (and has controlled) NXP BV, as well as many other subsidiaries, including NXP USA. On information and belief, NXP USA and/or NXP BV provide (and have provided) sales, distribution, research, and/or development support in the United States for their parent NXP NV, which owns NXP BV and NXP USA. NXP BV and NXP USA are, and have been, agents of NXP NV. At the direction and control of NXP NV, its subsidiaries, including NXP BV, and/or U.S.-based sales and/or distribution subsidiaries including, NXP USA, have imported and continue to import Accused Products into the United States and this District.

8.      On information and belief, NXP BV controls (and has controlled) many subsidiaries, including NXP USA. On information and belief, NXP USA provides (and has provided) sales, distribution, research, and/or development support in the United States for its parent NXP BV, which owns NXP USA. NXP USA is, and has been, an agent of NXP BV. At the direction and control of NXP BV, U.S.-based sales and/or distribution subsidiaries including, NXP USA, have imported and continue to import Accused Products into the United States and this District.

9.      On information and belief NXP NV controls (and has controlled) each of NXP BV and NXP USA. On information and belief, each of these related companies and other NXP companies are, and have been, agents of NXP NV. For example, NXP NV, NXP BV, and NXP USA use the same logo, further emphasizing that these companies are alter egos and/or agents of one another.

10.     On information and belief, NXP NV, NXP BV, and NXP USA, along with their respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and

manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length to provide (and have provided) a distribution channel of infringing products within this District and the U.S. nationally.

11.    NXP NV, NXP BV, and NXP USA operate (and have operated) in agency with one another and their respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, to provide a distribution channel of infringing products within this District and the U.S. nationally. NXP NV, NXP BV, and NXP USA, individually and/or between one another and their respective agents and foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and have directed) the Accused Products into established distribution channels within this District and the U.S. nationally.

12.    On information and belief, NXP NV, NXP BV, and NXP USA, including their respective U.S.-based subsidiaries, affiliates, distributors, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. NXP NV, NXP BV, and NXP USA, and their U.S.-based sales subsidiaries, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, using, testing, distributing, offering to sell, and selling the Accused Products that incorporate devices, systems, and processes that infringed the Asserted Patents in Texas and this District. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state…."); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory

may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

13.    Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Defendants' Accused Products by and/or to affiliates, distributors, subsidiaries, suppliers, retail partners, customers, agents, and/or other Defendants, Defendants are operating in (and have operated in) and maintaining (and maintained) a significant business presence in the U.S. and/or through their U.S. subsidiaries or agents, Defendants do business in the U.S., the state of Texas, and in this District.

14.    NXP NV, NXP BV, and NXP USA are companies which together comprise "a global semiconductor company and a long-standing supplier in the industry, with over 60 years of innovation and operating history." *See* https://investors.nxp.com/static-files/b8f7bcb5-5812-4709-aed4-f52d3d2a8eff at page 3. According to NXP, it provides technology solutions "in the domains of cryptography-security, high-speed interface, radio frequency (RF), mixed-signal analog-digital (mixed A/D), power management, digital signal processing and embedded system design." *Id*. NXP's "product solutions are used in a wide range of end market applications including: automotive, industrial & Internet of Things (IoT), mobile, and communication infrastructure." *Id*.

15.    NXP NV, NXP BV, and NXP USA share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and infringing product lines and products involving related technologies. On information and belief, Defendants operate as a single business entity and/or in concert with each other to manufacture, sell, offer to sell, import, market, advertise, and/or otherwise promote the Accused Products in the United States, including in the State of Texas generally and this District in particular. On information and

belief, Defendants share directors, executives, and employees. According to NXP, "NXP has one reportable segment representing the entity as a whole, which reflects the way in which our chief operating decision maker executes operating decisions, allocates resources, and manages the growth and profitability of the Company." *See* https://investors.nxp.com/static-files/b8f7bcb5-5812-4709-aed4-f52d3d2a8eff at page 3; *see also id*. at page 8 ("We manage our manufacturing assets together through one centralized organization to ensure we realize scale benefits in asset utilization, purchasing volumes and overhead leverage across businesses.").

16.     NXP, as a single enterprise of multiple operating subsidiaries acting in consort with one another, has a common Board of Directors with responsibility "for the overall conduct of the NXP Group." Rules Governing the Board of Directors of NXP Semiconductors N.V. (Aug. 2022) at Article 1.1. Annually, the common Board of Directors of the NXP Group sets "the corporate strategy of the NXP Group." *Id*. at Article 1.3(b).  The collective set of NXP entities, including Defendants, is managed, in consort, by a common management team to direct the manufacture, distribution, and sale of NXP products, including the Accused Products.

17.     NXP USA is a subsidiary of both NXP NV and NXP BV and engages in sales, advertising, marketing, and/or research in the United States on behalf of, and under the control of NXP NV and NXP BV. "NXP owns and operates four wafer fabrication facilities in the US, two of which are in Austin, Texas . . . . The representative products of these fabs include microcontrollers (MCUs) and microprocessors (MPUs), power management devices, RF transceivers, amplifiers and sensors." *See* https://www.nxp.com/company/about-nxp/worldwide-locations/united-states:USA.

18.     NXP employs numerous employees in Austin who possess information relevant to issues involving the Accused Products, including at least: (1) Executive VP and CFO, who

possesses knowledge related to the revenue of the accused products; (2) Senior VP and Chief IP Officer, who possesses knowledge relevant to damages and the hypothetical negotiation; (3) Senior Director and Head of IP Monetization, who has submitted patents relevant to the Accused Products and possesses knowledge relevant to damages; (4) Executive VP, General Counsel, Corporate Secretary, and Chief Sustainability Officer, who would possess information relevant to damages and reasonable royalty analysis; (5) Executive VP, Global Operations, who is responsible for overseeing NXP's manufacturing operations and would have relevant knowledge on the manufacturing of the Accused Products; (6) NXP's global head of sales, who possesses relevant knowledge of the sales and marketing of the Accused Products; (7) Technical Director, who works on the Accused Products; (8)-(9) two Austin-based NXP employees who are responsible for design-engineering of the Accused Products; (10) an NXP employee who is responsible for managing the relationship with a third party that fabricates the Accused Products; (11) an NXP employee who manages NXP's public relations and worked on the marketing of one or more Accused Products; (12) Senior Manager of Product Marketing; (13) employees in NXP's i.MX 8M evaluation kit group, who are responsible for ensuring software drivers in the Accused Products are compatible with an i.MX 8M Quad multimedia processor unit; and (14) an employee in NXP's sales organization who works with the Wireless Connectivity Solution Group responsible for the Accused Products. *See MIMO RESEARCH, LLC v. NXP USA, Inc.*, No. W:22-CV-00501-ADA (W.D. Tex. Apr. 20, 2023), Dkt. 71 at pp. 9-10.

19.     NXP has posted 56 job listings in Austin that are related to the research, development, manufacturing, sales, testing, and/or marketing of the Accused Products. *See* https://nxp.wd3.myworkdayjobs.com/careers?locations=3db468d56aa610d690867492f6a44a10 &locations=3db468d56aa610d6908623b4269049aa (exemplary NXP job titles in Austin include

Sr Director, SoC Design; Senior Verification Engineer; Senior Principal Verification Engineer; SoC Hardware Architect; Software Enablement Technical Marketing Manager; Entry Level Product/Test Engineers; Internships in Product/Test Engineering; IoT Segment Product Line Manager; Product Marketing; Systems Architecture and Design Leader/Fellow Microprocessors and Microcontrollers; Director, and IP Design Engineering.).

20.     NXP owns, manages, and/or operates a highly interactive website at https://www.nxp.com/. NXP BV is listed as the registrant, administrative contact, and technical contact for the NXP.com website. *See* https://lookup.icann.org/en/lookup.

21.     The "Privacy Statement" webpage on the NXP.com website states that "When this Privacy Statement refers to 'we', ' us' or 'our', it refers to NXP B.V. and affiliates or subsidiaries which under this Privacy Statement may act as a controller of your personal information ... . " *See* https://www.nxp.com/pages/privacy-statement:PRIVACYPRACTICES.     Furthermore,     the Privacy Statement also provides contact details for questions regarding the Privacy Statement to be addressed to NXP Semiconductors N.V., Attn. Data Protection Office, High Tech Campus 60, 5656AG Eindhoven, The Netherlands. *Id*. A link to this Privacy Statement is included on all webpages of the NXP.com website.

22.     From the NXP.com website, customers and end users in the United States can purchase NXP products including but not limited to the Accused Products. *See* https://www.nxp.com/support/sample-and-buy:SAMPLE-BUY ("Whether you prefer to purchase direct from us or use your preferred distributor you'll find quantities and pricing for all our NXP and third-party products.") NXP explains, "Through our online catalog and shopping cart, you can quickly and easily buy parts, software, development tools or third-party products that have a "Buy from NXP" button Buy from NXP next to them. Simply click the button to add the product to your

cart and then make your purchase using major credit cards, wire transfers or purchase orders. Items can be shipped to virtually anywhere in the world." *See* https://www.nxp.com/support/sample-and-buy/buy-from-nxp:WTOBUY_BUYDIRECT.

23.     The NXP.com website offers extensive and interactive training for customers and end users on the design and use of NXP products, including the Accused Products. https://www.nxp.com/support/support/training:TRAINING-EVENTS.

24.     The NXP.com website provides customers, potential customers, and/or end users located in the United States or elsewhere with real-time, interactive support and guidance on the use of NXP products, including but not limited to the Accused Products. https://www.nxp.com/support/support:SUPPORTHOME. For example, customers, potential customers, and/or end users can interact with the NXP.com website to provide support and guidance as to NXP products, including the Accused Products. *Id*. Such interaction provided by the NXP.com website includes participating in an open forum for technical discussions moderated by NXP experts; requesting confidential assistance with an NXP support professional through support tickets; or participating in a live chat with NXP employees. *Id*.

25.     NXP provides additional interactivity for those customers and end users who create an account on the NXP.com website. For the website users with an NXP.com account, NXP offers: Access to our full public library of technical content, including documentation, training, and software via collections; Access authorized secure information about our products. Apply online for an NDA with NXP to get started; Engage with a vibrant and active ecosystem of engineers and specialists in the NXP Community; Get timely and confidential world-class assistance from an NXP Support Professional;  Queue up multiple documents or items to download when it's easiest for you using the download manager; and Get the first notification about new NXP products and

services via our newsletter. https://www.nxp.com/support/support/my-nxp-account-benefits/my-nxp-account-faqs:NXP-ACCOUNT-FAQS.

26.     NXP encourages and rewards active engagement on the NXP.com website by NXP customers and end users. For example, NXP.com users can earn badges and rewards. https://www.nxp.com/support/support/my-nxp-account-benefits:NXP-ACCOUNT-BENEFITS.

27.     NXP is willing to share "Proprietary or Confidential Information" with those customers and end users who create an account on the NXP.com website and complete a Non-Disclosure Agreement with NXP. https://www.nxp.com/support/support/non-disclosure-agreement-faqs:NDA-FAQS. The NXP.com website permits users to "Apply for an NDA with NXP" directly through the NXP.com website. *Id*. The website also includes a "Sample Letter," which provides a template for an NDA between an NXP.com website user and an NXP entity to be filled in by an NXP employee. *Id*.

28.     Prior to the filing of the Complaint, Redwood sent a letter received by NXP on November 8, 2021, where Redwood attempted to engage NXP in licensing discussions related to the Asserted Patents for reasonable and non-discriminatory terms for a license to be taken in the absence of litigation. Indeed, NXP has known about each of the Asserted Patents since at least November 8, 2021, when NXP received notice of its infringement of the Asserted Patents via the letter sent by Redwood.

29.     Prior to the filing of the Complaint, Redwood sent several emails to NXP, including an email received by NXP on January 24, 2022, where Redwood again attempted to engage NXP in licensing discussions related to the Asserted Patents for reasonable and non-discriminatory terms for a license to be taken in the absence of litigation. Indeed, NXP has known about each of the Asserted Patents since at least May 12, 2022 when NXP received the second notice of its

infringement of the Asserted Patents via email where Redwood again attempted to engage NXP in licensing discussions related to the Asserted Patents for reasonable and non-discriminatory terms for a license to be taken in the absence of litigation.

30.    To date, NXP has not agreed to license the Asserted Patents for reasonable and non-discriminatory terms. On January 24, 2022, NXP stated that it was declining to access or review any Redwood documents or otherwise engage in any licensing dialogue with Redwood. Redwood's readiness to continue with negotiations. On that same day, Redwood emailed NXP notifying NXP that Redwood considered any RAND obligations to the IEEE fulfilled because of NXP's apparent refusal to engage in any licensing dialogue where Redwood advised NXP that Redwood's offer would be valid for 30 days. On July 31, 2023, Redwood offered NXP a last opportunity to discuss licensing as a prelitigation resolution. On December 13, 2023, Redwood made yet another offer to license the Asserted Patents to NXP for reasonable and non-discriminatory terms. NXP declined this offer on January 16, 2024 and refused to make a counteroffer.

31.    Furthermore, as a member of the relevant standards-setting bodies, on information and belief, NXP is on notice of standard essential patents issued to other members of the standards bodies.

32.    NXP's past and continuing making, using, selling, offering for sale, and/or importing, and/or inducing subsidiaries, affiliates, retail partners, distributors, manufacturers of end user devices, customers, and other third parties in the making, using, selling, offering for sale, and/or importing the Accused Products throughout the United States i) willfully infringe each of the Asserted Patents and ii) impermissibly take the significant benefits of Redwood's patented technologies without fair compensation to Redwood.

33.    NXP is engaged in making, using, testing, selling, offering for sale, and/or importing, and/or induces subsidiaries, affiliates, retail partners, distributors, manufacturers of end user devices, customers, and other third parties in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, the Accused Products, such as Wi-Fi compliant components as well as access points, mobile devices, automotives, IoT devices and other products that include NXP's Wi-Fi compliant components, accused of infringement.

34.    On information and belief, NXP NV, NXP BV, and NXP USA operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

## JURISDICTION AND VENUE

35.    This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

36.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

37.    With respect to NXP NV and NXP BV (the "foreign Defendants"), venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c). The foreign Defendants are foreign entities and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3).

38.    With respect to NXP USA, venue is proper in this District under 28 U.S.C. § 1400(b). NXP USA has committed acts of infringement in the District and/or has induced acts of patent infringement by others in this District and has a regular and established place of business within the District. For example, NXP USA has regular and established places of businesses within

this District including its U.S. Corporate Headquarters located at 6501 W. William Cannon Dr., Austin, TX 78735; and 3501 Ed Bluestein Blvd., Austin, TX 78721.

39.    This Court has general and specific personal jurisdiction over the Defendants pursuant to due process and/or the Texas Long Arm Statute because, inter alia, (i) the Defendants have done and continue to do business in Texas and/or (ii) the Defendants have, directly and through intermediaries, distributers, agents, and/or others committed and continue to commit acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling Accused Products in Texas, and/or importing Accused Products into Texas, including by Internet sales (including acts of infringement via NXP.com's highly interactive website) and/or sales via retail and wholesale stores, inducing others to commit acts of patent infringement in Texas (including inducement via NXP.com's highly interactive website), and/or committing a least a portion of any other infringements alleged herein. Defendants have placed, and are continuing to place, infringing products into the stream of commerce, via established distribution channels, with the knowledge and/or understanding that such products are sold in Texas, including in this District. Defendants have derived substantial revenues from their infringing acts occurring within Texas and within this District. Defendants have substantial business in this State and District (including, as relevant, in the past), including: (A) conducting at least part of their infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and/or imported, and services provided to Texas residents vicariously through and/or in concert with their respective alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

40.    This Court has personal jurisdiction over Defendants, directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers including their U.S.-based sales subsidiaries, as applicable. Through direction and control (including, as relevant, in the past) of such subsidiaries, affiliates, distributors, retail partners, agents, and/or customers, Defendants have committed acts of direct and/or indirect patent infringement within Texas, and elsewhere within the United States, giving rise to this action and/or have established minimum contacts with Texas such that personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Upon information and belief, Defendants compensate their U.S.-based subsidiaries and/or agents for their sales support services in the United States. As such, Defendants have a direct financial interest in their U.S.-based subsidiaries and/or agents, and vice versa.

41.    Personal jurisdiction is proper because Defendants have committed acts of infringement in this District. This Court has personal jurisdiction over Defendants because, inter alia, this action arises from activities Defendants purposefully directed towards the State of Texas and this District (including Defendants' activities via NXP.com's highly interactive website).

42.    On information and belief, NXP (directly and/or through its subsidiaries, affiliates, or intermediaries) owns, operates, or controls facilities that include offices and fabrication facilities in Austin, Texas where infringing products are designed, developed, manufactured, tested, used, marketed, imported, exported, offered for sale, and/or sold into a stream of commerce that includes this District. On information and belief, NXP employs over 1800 employees in the Austin area. *See* https://www.linkedin.com/company/nxp-semiconductors/people/?facetGeoRegion=90000064.

43.    Exercising personal jurisdiction over Defendants in this District would not be unreasonable given Defendants' contacts in this District, the interest in this District of resolving disputes related to products sold herein, and the harm that would occur to Plaintiff who resides in this District.

44.    In addition, Defendants, as applicable, have knowingly induced infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof (including such activities provided via Defendants' NXP.com website).

45.    Personal jurisdiction also exists specifically over Defendants because Defendants, directly or through affiliates, subsidiaries, agents, and/or intermediaries, transact business (or have transacted business) in this State or purposefully directed business at this State by making, importing, testing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

46.    Personal jurisdiction also exists specifically because Defendants and/or their U.S.-based subsidiaries, as applicable, have overlapping executives, interlocking corporate structures, and close relationships as manufacturer, importer, distributor, and/or seller of the products accused of infringement.

47.    To the extent the foreign Defendants are not subject to jurisdiction in any state's court of general jurisdiction, exercising jurisdiction over the foreign Defendants in this State and

this District would be consistent with due process and this State's long-arm statute and under national contacts in light of the facts alleged in this Complaint.

48.     In addition, Defendants, directly or through other Defendants, affiliates, subsidiaries, agents, and/or intermediaries, have placed infringing products into the stream of commerce knowing they would be sold and used in Texas, and economically benefit from the retail sale of infringing products in this State, including in this District.

49.     Defendants have advertised their infringing products to customers in Texas and this District through their NXP.com website.

50.     On information and belief, the foreign Defendants control (or have controlled) or otherwise direct (or directed) and authorize (or authorized) all activities of their U.S.-based agents and/or sales and/or distribution subsidiaries, as applicable. Such directed and authorized activities include the U.S.-based subsidiaries' and/or agents having used, offered for sale, sold, and/or imported the Accused Products, their components, processes, and/or products containing the same that incorporated the fundamental technologies and claims of the Asserted Patents. The foreign Defendants' U.S.-based sales and/or distribution subsidiaries and/or agents were authorized to import, distribute, sell, or offer for sale the Accused Products on behalf of the foreign Defendants. For example, the foreign Defendants researched, designed, developed, and manufactured the Accused Products, and then directed their U.S.-based sales subsidiaries, distributers, agents, and others to import, distribute, offer for sale, and sell the Accused Products in the United States. *See, e.g., United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Thus, Defendants conducted infringing activities, and the foreign

Defendants' U.S.-based sales subsidiaries and/or distributers and/or agents conducted infringing activities on behalf of the foreign Defendants.

51.     On information and belief, the foreign Defendants' U.S.-based sales and/or distribution subsidiaries' and/or agents' presence (including in the past) in the United States gave the foreign Defendants substantially the same business advantages that they would have enjoyed if the foreign Defendants conducted their business through their own offices or paid agents in the state. The foreign Defendants' U.S.-based sales subsidiaries and/or distributers and/or agents were authorized to import, distribute, sell, and offer for sale Defendants' products, including Defendants' Accused Products, as well as their components and processes related to the same, on behalf of the foreign Defendants. For example, Defendants' U.S.-based sales subsidiaries operated within Defendants' global network and supply chain of sales subsidiaries. In the U.S., including within this District, Defendants' Accused Products, as well as their components and processes related to the same, were imported, distributed, offered for sale, and/or sold.

52.     Via Defendants' alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers that maintained a business presence, operating in, and/or residing in the U.S., Defendants' products, including products and processes accused of infringing the Asserted Patents, are or have been widely distributed and sold in Texas including within this District. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to customers in the U.S. may constitute an offer to sell under § 271(a)).

53.     On information and belief, Defendants have placed infringing products and/or products that practiced infringing processes into the stream of commerce via established distribution channels comprising at least their subsidiaries, affiliates, distributors, and/or agents or customers, with the knowledge and/or intent that those products were imported, used, offered for sale, and sold in the United States and Texas, including in this District. As a result, Defendants have, vicariously through and/or in concert with other Defendants, alter egos, agents, intermediaries, distributors, affiliates, importers, customers, subsidiaries, and/or consumers, placed the Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas, including in this District.

54.     In the alternative, the Court has personal jurisdiction over the foreign Defendants under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal law, foreign Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state and exercising jurisdiction over the foreign Defendants is consistent with the U.S. Constitution.

55.     The foreign Defendants have minimum contacts with the United States. The foreign Defendants offer their stock on the NASDAQ. Furthermore, the foreign Defendants have purposefully targeted the U.S. market and this District as to the Accused Products by acquiring U.S. companies as evidenced by NXP's merger with Freescale Semiconductor, Ltd. in 2015 and NXP's acquisition of Marvell's Wi-Fi Connectivity Business in 2019. Additionally, the foreign Defendants purposefully target U.S. users of their NXP.com website to: gather privacy information; provide instruction materials, training, support, and user guides of NXP products, including the Accused Products; and/or offer for sale, ship, distribute, import, and/or sell NXP

products, including the Accused Products, directly from NXP or via its distributors or intermediaries.

56.    With respect to the '130 patent and the '517 patent, the Accused Products are devices that include, but are not limited to, NXP's devices and third party devices that include one or more of NXP's devices that are compliant with IEEE 802.11s (*e.g.*, the W8987 series), as well as, their components (*e.g.*, hardware, software, and/or firmware), and processes related to the same. With respect to the '102 patent, the Accused Products are devices that include, but are not limited to, NXP's devices and third party devices that include one or more of NXP's devices that are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax (*e.g.*, the 88MW30X, 88MW32X, 88W8964, 88W9064, CW641, 88W8887, 88W8977, 88W8897, 88W8987, 88W9098, 88W8997, 88W8801, IW416, IW611, IW612, IW620, RW612, RW610, 88MW320/322, AW693, AW611, AW690, 88Q9098, 88Q9098S, 88W8987, W8987, 88W8887, and 88W8897P series), as well as, their components (*e.g.*, hardware, software, and/or firmware), and processes related to the same. With respect to the '901 patent, '371 patent, '224 patent, '005 patent, and '300 patent, the Accused Products are devices that include, but are not limited to, NXP's devices and third party devices that include one or more of NXP's devices that are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax (*e.g.*, the 88W8964, 88W9064, CW641, 88W8897, 88W9098, 88W8997, IW620, 88Q9098, and 88Q9098S series), as well as, their components (*e.g.*, hardware, software, and/or firmware), and processes related to the same.[1]

---

[1] Each of the relevant standards cited herein, and related to the Asserted Patents, are specifically incorporated into this Complaint.

**COUNT I**

(INFRINGEMENT OF U.S. PATENT NO. 7,664,130)

57.    Plaintiff incorporates paragraphs 1 through 56 herein by reference.

58.    Redwood is the assignee of the '130 patent, entitled "Wireless Communication System, Wireless Communication Apparatus, Wireless Communication Method, and Computer Program," with ownership of all substantial rights in the '130 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

59.    The '130 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '130 patent issued from U.S. Patent Application No. 11/066,482.

60.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '130 patent in this judicial district and elsewhere in Texas and the United States.

61.    NXP directly infringes the '130 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '130 patent.

62.    Furthermore, NXP NV directly infringes the '130 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '130 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '130 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '130 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries

(under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '130 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

63.     For example, NXP infringes claim 10 of the '130 patent via the Accused Products, including the W8987 series. The Accused Products, including the W8987 series, are compliant with IEEE 802.11s and comprise a wireless communication station. *See, e.g.*, Fig. 19-2 of IEEE 802.11 2016; https://site.eettaiwan.com/webinar/pdf/NXP_Live_Webinar_20210202.pdf, NXP Wi-Fi/BT Introduction (February 2021) at p. 21 (NXP advertising that the W8987 series of products are compliant with IEEE 802.11s); and https://www.nxp.com/products/wireless-connectivity/wi-fi-plus-bluetooth-plus-802-15-4/88w8987-automotive-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-2-solution:88W8987A (NXP advertising that the 88W8987 features include Wi-Fi Stations and/or Access Point).

64.     The Accused Products, including the W8987 series, each comprise a transmitter configured to transmit beacons with information associated with a network being described therein

to other communication stations to construct a network. For example, the Accused Products, including the W8987 series, comprise a transmitter configured to transmit a beacon containing a Mesh Configuration element advertising the mesh services of a mesh network. *See, e.g.*, Sections 9.3.3.3, 9.4.2.98.1 and 14.13.3.31 of IEEE 802.11 2016.

65.    The Accused Products, including the W8987 series, each comprise a receiver configured to receive timing information concerning priority transmission of a neighborhood communication station from said other communication stations. For example, the Accused Products comprise a receiver configured to receive a beacon that contains the Beacon Timing element, which comprises Beacon Timing Information fields that prioritize transmissions from neighborhood communications to avoid Beacon frame collisions. *See, e.g.*, Sections 9.4.2.105, 14.13.4.2.6, and 14.13.4.3 and Figures 9-462 and 9-464 of IEEE 802.11 2016.

66.    The Accused Products, including the W8987 series, each comprise a transmitter further configured to transmit a message to the neighborhood communication station, the message requesting a report of timing information concerning priority transmission of the neighborhood communication station. For example, the Accused Products, including the W8987 series, each comprise a transmitter further configured to transmit a Probe Request frame to request Beacon Timing Information concerning priority transmission of the neighborhood communication station. *See, e.g.*, Section 14.13.4.2.6 and Figure 9-464 of IEEE 802.11 2016.

67.    The specific ways in which the Accused Products, including the W8987 series, are configured to support the aforementioned features of IEEE 802.11 2016 are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 10 of the '130 patent.

68.    Furthermore, the Accused Products, including the W8987 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 10 of the '130 patent.

69.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

70.    The claims of the '130 patent are patent eligible under 35 U.S.C. § 101. The '130 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it offers, for example, a technologically complex invention that "relates to a wireless communication system, a wireless communication apparatus, a wireless communication method and a computer program, all enabling each communication station to evade mutual interference while performing communication securing a band by providing a prioritized utilization region." '130 patent, 1:35-41. The '130 patent provides a technical solution to advance the goal above, for example, by describing that "each communication station can gather the transmission-reception dangerous zone by receiving the prioritized transmission frame from a neighboring station, and the system may be adapted so that each communication station informs the acquired information pertaining to the transmission-reception dangerous zone to the neighboring station. In such a case, when each communication station tries to perform a frame transmission, the communication station can prevent collisions previously by performing the frame transmission in the way of avoiding the transmission-reception dangerous zones recorded in the information signal received from the transmission destination." '130 patent, 14:30-41. That solution is reflected in independent claim 10 of the '130 patent, which includes a limitation that recites "requesting a report of timing information concerning priority transmission of the neighborhood communication station."

71.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '130 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '130 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '130 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 28, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '130 patent when Redwood provided an infringement chart of the '130 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '130 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '130 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '130 patent from at least the foregoing dates that NXP USA was on notice of the '130 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[2]

---

[2] *See e.g., Nat'l Inst. for Strategic Tech. Acquisition & Commercialization v. Nissan of N. Am.*, No. 11-11039, 2012 U.S. Dist. LEXIS 117941, at *14 (E.D. Mich. Aug. 21, 2012) ("It is also a reasonable inference that a Japanese parent company, Honda Motor Company, which received NISTAC's letter concerning the patents-in-suit, would

72.     On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '130 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '130 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

---

communicate with its United States subsidiary, American Honda, about these patents and potential infringement thereof.").

73.     On information and belief, despite having knowledge of the '130 patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '130 patent. For example, Defendants specifically intended for its U.S.-based subsidiaries or customers to import and sell products accused of infringing the '130 patent. On information and belief, Defendants instructed and encouraged the importers to import and/or sell products accused of infringing the '130 patent. On information and belief, the purchase and sale agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries, affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of importing and selling products accused of infringing the '130 patent in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

74.     On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United States, or importing into the United States, components of the patented invention of one or more claims of the '130 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '130 patent by making the Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products

within the United States; the components constitute a material part of the claimed inventions of the '130 patent that are especially made or especially adapted for use in end user products that infringe the '130 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

75.     On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention of one or more claims of the '130 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '130 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '130 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United

States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the   Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.,* https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

76.   On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes supplying or causing to be supplied in or from the United States components of the patented invention of one or more claims of the '130 patent that are especially made or especially adapted

for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '130 patent, where such components are uncombined in whole or in part, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '130 patent, where such components are uncombined in whole or in part with other components of an end user device, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

77.     On information and belief, despite having knowledge of the '130 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '130 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '130 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

78.     Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## **COUNT II**
(INFRINGEMENT OF U.S. PATENT NO. 7,917,102)

79.     Plaintiff incorporates paragraphs 1 through 78 herein by reference.

80.     Redwood is the assignee of the '102 patent, entitled "Radio Transmitting Apparatus and Radio Transmission Method," with ownership of all substantial rights in the '102 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

81.     The '102 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '102 patent issued from U.S. Patent Application No. 11/937,422.

82.     NXP has and continues to directly and/or indirectly infringe one or more claims of the '102 patent in this judicial district and elsewhere in Texas and the United States.

83.     NXP directly infringes the '102 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '102 patent.

84.     Furthermore, NXP NV directly infringes the '102 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '102 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '102 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '102 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United

States, thereby directly infringing the '102 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

85.    For example, NXP infringes claim 3 of the '102 patent via the Accused Products, including the 88W8997 series. The Accused Products, including the 88W8997 series, each are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax, and each comprise a radio transmitting apparatus that transmits a modulated signal. *See, e.g.*, https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

### 88W8997 BLOCK DIAGRAM



*Id*.

86.    The Accused Products, including the 88W8997 series, each comprise circuitry and/or components (hardware and/or software) that forms a transmission frame which includes a frequency offset estimation signal for estimating frequency offset of the modulated signal at a receiving apparatus, a channel fluctuation estimation signal for estimating channel fluctuation of the modulated signal at the receiving apparatus and a gain control signal for performing gain control of the modulated signal at the receiving apparatus. The Accused Products, including the

88W8997 series, must be configured to form the claimed "transmission frame" for a HT-mixed format PPDU frame, which is a mandatory feature of IEEE 802.11 2016. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016; https://www.albany.edu/faculty/dsaha/teach/2019Spring_CEN574/slides/08_WLAN.pdf at slides 67-68 (the HT-mixed format PPDU is mandatory). For example, the Accused Products, including the 88W8997 series, each form a HT-mixed format PPDU frame, which comprises an L-LTF subframe, which is a frequency offset estimation signal. *See, e.g.*, Figures 17-4 and 19-1 of IEEE 802.11 2016. The HT-mixed format PPDU frame also comprises an HT-LTF subframe, which is a channel fluctuation estimation signal. *See, e.g.*, Figure 19-1 and Section 19.3.9.4.6 of IEEE 802.11 2016. The HT-mixed format PPDU frame also comprises an L-STF subframe, which is a gain control signal. *See, e.g.*, Figure 19-1 and Section 19.3.9.3.3 of IEEE 802.11 2016.

87.    The Accused Products, including the 88W8997 series, each comprise circuitry and/or components (hardware and/or software) configured to transmit the transmission frame. For example, the Accused Products, including the 88W8997 series, must be configured to transmit a transmission frame for a HT-mixed format PPDU, which is a mandatory feature of IEEE 802.11 2016. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016; https://www.albany.edu/faculty/dsaha/teach/2019Spring_CEN574/slides/08_WLAN.pdf at slides 67-68 (the HT-mixed format PPDU is mandatory).

88.    The transmission frame includes a first gain control signal and a second gain control signal. For example, the HT-mixed format PPDU comprises a first gain control signal in the L-STF subframe and a second gain control signal in the HT-STF subframe. *See, e.g.*, Figure 19-1 and Sections 19.3.9.3.3 and 19.3.9.4.5 of IEEE 802.11 2016. The first gain control signal is arranged prior to the frequency offset estimation signal. For example, the L-STF subframe is

arranged prior to the L-LTF subframe. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016. The second gain control is arranged subsequent to the frequency offset estimation signal and prior to the channel fluctuation estimation signal. For example, the HT-STF subframe is arranged subsequent to the L-LTF subframe and prior to the HT-LTF subframe. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016.

89.    The specific ways in which the Accused Products, including the 88W8997 series, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to Claim 3 of the '102 patent.

90.    Furthermore, the Accused Products, including the 88W8997 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 3 of the '102 patent.

91.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

92.    The claims of the '102 patent are patent eligible under 35 U.S.C. § 101. The '102 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, for example, it offers a technologically complex, particularized "radio transmitting apparatus and radio transmission method that enable[s] reception quality to be improved by reducing pilot symbol and data symbol quantization error in a system in which the number of simultaneously transmitted modulated signals is changed according to the propagation environment and so forth." '102 patent, 2:12-18. The '102 patent provides the technical solution above, for example, by "changing the transmit power of the modulated signal transmitted from each antenna according to

the number of antennas that simultaneously transmit modulated signals (that is, the number of modulated signals)." '102 patent, 2:19-22. That solution is reflected in the claims 1, 3, 5, and 10 of the '102 patent, which include, for example, gain control limitations that can be used in the changing of the transmit power of the modulated signals. See, e.g., '102 patent, 17:34-50.

93.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '102 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '102 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '102 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '102 patent when Redwood provided an infringement chart of the '102 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '102 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '102 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '102 patent from at least the foregoing dates that NXP USA was

on notice of the '102 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[3]

94.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '102 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '102 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

---

[3] *See* FN 2, *supra*.

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

95.    On information and belief, despite having knowledge of the '102 patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '102 patent. For example, Defendants specifically intended for its U.S.-based subsidiaries or customers to import and sell products accused of infringing the '102 patent. On information and belief, Defendants instructed and encouraged the importers to import and/or sell products accused of infringing the '102 patent. On information and belief, the purchase and sale agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries, affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of importing and selling products accused of infringing the '102 patent in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

96.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United States, or importing into the United States, components of the patented invention of one or more claims of the '102 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '102 patent by making the Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce

suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '102 patent that are especially made or especially adapted for use in end user products that infringe the '102 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

97.     On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention of one or more claims of the '102 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '102 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of

the '102 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the  Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

98.     On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes

supplying or causing to be supplied in or from the United States components of the patented invention of one or more claims of the '102 patent that are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '102 patent, where such components are uncombined in whole or in part, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '102 patent, where such components are uncombined in whole or in part with other components of an end user device, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. *See,* *e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

99.　On information and belief, despite having knowledge of the '102 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '102 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '102 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

100.　Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
### (INFRINGEMENT OF U.S. PATENT NO. 7,688,901)

101.　Plaintiff incorporates paragraphs 1 through 100 herein by reference.

102.　Redwood is the assignee of the '901 patent, entitled "Transmission Method, Transmission Apparatus, and Reception Apparatus," with ownership of all substantial rights in the '901 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

103.　The '901 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '901 patent issued from U.S. Patent Application No. 10/486,895.

104. NXP has and continues to directly and/or indirectly infringe one or more claims of the '901 patent in this judicial district and elsewhere in Texas and the United States.

105. NXP directly infringes the '901 patent via 35 U.S.C. § 271(a) by using and/or testing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '901 patent. As another example, NXP infringes each step of the one or more method claims of the '901 patent because the NXP Accused Products automatically, and without user modification, perform each of the claimed steps that are controlled by NXP.

106. Furthermore, NXP NV directly infringes the '901 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '901 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '901 patent under 35 U.S.C. § 271(a) by using and/or testing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '901 patent. Further, Defendants are vicariously liable for this infringing conduct of their respective subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so

intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '901 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

107.    For example, NXP infringes claim 1 of the '901 patent via the Accused Products. The Accused Products, including the 88W8997 series, transmit modulation signals. *See, e.g.*, Sections 19.1.1 and 19.1.2 of IEEE 802.11 2016; https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

**88W8997 BLOCK DIAGRAM**



*Id*.

108.    The Accused Products, including the 88W8997 series, each generate a plurality of modulation signals each of which is to be transmitted from a different one of a plurality of antennas, where each modulation signal is to include one or more preamble symbol groups each consisting of a plurality of preamble symbols used for demodulation. For example, the Accused

Products generate modulation signals (e.g., HT-mixed format PPDUs) which are to be transmitted from a plurality of antennas. *See, e.g.*, Sections 19.3.3 of IEEE 802.11 2016. Each OFDM symbol within a modulation signal comprises a pilot symbol sequence consisting of four pilot symbols used for demodulation. *See, e.g.*, Sections 17.3.5.9 and 19.3.11.10 of IEEE 802.11 2016.

109.    The Accused Products, including the 88W8997 series, each insert the one or more preamble symbol groups at the same one or more temporal points in each modulation signal, wherein the one or more preamble symbol groups at the one or more temporal points are orthogonal to other preamble symbol groups at the same one or more temporal points with zero mutual correlation among the plurality of modulation signals, each preamble symbol having a non-zero amplitude, and each preamble symbol group consisting of preamble symbols the quantity of which is greater than that of the plurality of modulation signals to be transmitted. For example, each of the Accused Products insert one or more OFDM symbols comprising a pilot symbol sequence in each modulation signal, where each modulation signal that are to be sent from different antennas are transmitted simultaneously in time. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016. The pilot symbol sequences corresponding to different spatial streams are orthogonal at the same one or more temporal points with zero mutual correlation among the plurality of spatial streams. *See, e.g.*, Table 19-19 of IEEE 802.11 2016. The pilot symbols are BPSK modulated and have a non-zero amplitude. *See, e.g.*, Section 17.3.5.9 of IEEE 802.11 2016. Each pilot symbol sequence contains four pilot symbols, which is greater than the modulation signals to be transmitted by two or three antennas. *See, e.g.*, Sections 19.1.1 and 19.3.11.10 of IEEE 802.11 2016.

110.    The Accused Products, including the 88W8997 series, each transmit the plurality of modulation signals, each comprising transmission data, which is different between the plurality of modulation signals, and the one or more preamble symbol groups, from the plurality of antennas,

respectively, in an identical frequency band. For example, each of the Accused Products transmit the plurality of modulation signals comprising transmission data and the pilot symbol sequence from the two or three antennas in the same channel having a particular width (*e.g.*, 20 MHz). *See, e.g.*, Section 19.3.15.1, Tables 19-28, 19-29, and 19-30, and Figure 17-13 of IEEE 802.11 2016. Each stream of data to be transmitted is divided into multiple spatial streams to form respective modulation signals having different transmission data during the encoding process. *See, e.g.*, Section 19.3.4 of IEEE 802.11 2016.

111.    The specific ways in which the Accused Products, including the 88W8997 series, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products, including the 88W8997 series, as to Claim 1 of the '901 patent.

112.    Furthermore, the Accused Products, including the 88W8997 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '901 patent.

113.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

114.    The claims of the '901 patent are patent eligible under 35 U.S.C. § 101. The '901 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it is a technologically complex, particularized method of transmitting modulation signals. As the '901 patent explains, the "present invention aims to provide a transmission method for estimating channels accurately and with ease from multiplexed modulation signals." '901 patent, 1:50-52.

The '901 patent further explains that the "conventional structure gives no thought to the synchronization between channels in the same frequency band as well as a frequency offset. As a result, this structure encounters the difficulty of achieving the most important factor in order to demultiplex a multiplexed signal, namely, obtaining an accuracy of estimating channels." '901 patent, 1:41-45.

115.    The '901 patent provides the technical solution above by, for example, "plac[ing] the symbols used for demodulation at an identical time of the respective channels and orthogonally to each other." '901 patent, 2:16-18. The '901 patent explains that "[t]his preparation, i.e. the symbols used for demodulation are placed to be orthogonal to each other, allows the reception apparatus to isolate the symbols with ease for estimating channels." '901 patent, 2:18-22. That solution is reflected in the claims of the '901 patent such as independent claim 1.

116.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '901 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '901 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '901 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '901 patent when Redwood provided an infringement chart of the '901 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '901 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '901 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the

aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '901 patent from at least the foregoing dates that NXP USA was on notice of the '901 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[4]

117.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '901 patent by testing and/or using the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '901 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the  Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or

---

[4] *See* FN 2, *supra*.

making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products that are then used and/or tested by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

118. On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United States, or importing into the United States, components of the patented invention of one or more claims of the '901 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '901 patent by making the NXP Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '901 patent that are especially made or especially adapted for use in end user products that infringe the '901 patent; and the components are not a staple article or commodity of

commerce    suitable    for    substantial    noninfringing    use.    *See,    e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

119.    On information and belief, despite having knowledge of the '901 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '901 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '901 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

120.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

<u>**COUNT IV**</u>

(INFRINGEMENT OF U.S. PATENT NO. 7,974,371)

121.    Plaintiff incorporates paragraphs 1 through 120 herein by reference.

122.    Redwood is the assignee of the '371 patent, entitled "Communication Method and Radio Communication Apparatus," with ownership of all substantial rights in the '371 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

123.    The '371 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '371 patent issued from U.S. Patent Application No. 10/486,896.

124.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '371 patent in this judicial district and elsewhere in Texas and the United States.

125.    NXP directly infringes the '371 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '371 patent.

126.    Furthermore, NXP NV directly infringes the '371 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '371 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '371 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '371 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors,

and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '371 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

127.    For example, NXP infringes claim 14 of the '371 patent via the Accused Products, including the 88W8997 series. The Accused Products, including the 88W8997 series, comprise a radio transmission apparatus. *See, e.g.*, Fig. 19-2 of IEEE 802.11 2016; https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

### 88W8997 BLOCK DIAGRAM



*Id.*

128.    The Accused Products, including the 88W8997 series, each comprise circuitry and/or components (hardware and/or software) comprising a transmission method determining

unit configured to select one of a first transmission method and a second transmission method based on received information of an estimated radio-wave propagation environment corresponding to a communication partner. For example, the Accused Products receive information associated with a channel quality assessment to select an appropriate Modulation and Coding Scheme (MCS) for Accused Products to utilize in subsequent transmissions to a receiving station, where the MCS value is utilized to determine the modulation, coding, and number of spatial channels based on information associated with the channel quality assessment. *See, e.g.*, Sections 19.3.13.4 and 19.3.5 of IEEE 802.11 2016.

129.   The Accused Products, including the 88W8997 series, each comprise circuitry and/or components (hardware and/or software) comprising a modulation signal generator configured to generate a single modulation signal if said transmission method determining unit choose selects said first transmission method, and to generate a plurality of modulation signals which include different information from each other for transmission to an identical frequency band at an identical temporal point, if said transmission method determining unit selects said second transmission method. For example, if the MCS indicates that a transmission will utilize only one spatial stream, the Accused Products generate a single modulation signal. *See, e.g.*, Section 19.3.5 of IEEE 802.11 2016. If the MCS indicates that a transmission will include multiple spatial streams for, *e.g.*, spatial multiplexing, a plurality of modulation signals are produced, where each of the modulation signals represents a respective spatial stream and each spatial stream includes distinct information. *See, e.g.*, Section 19.3.5 of IEEE 802.11 2016. Spatial multiplexing increases bandwidth by transmitting data over multiple available spatial channels. Transmissions are simultaneous and are transmitted using the same channel having a particular width (*e.g.*, 20 MHz). *See, e.g.*, Section 19.3.15.1 and Tables 19-28, 19-29, and 19-30 of IEEE 802.11 2016.

130.    The single modulation signal and the plurality of modulation signals contain information indicating the number of modulation signals to multiplex and transmit at the same time. For example, all HT transmissions of the Accused Products, including the 88W8997 series, utilize an HT-SIG, which contains an MCS that indicates the number of modulation signals to multiplex and transmit at the same time. *See, e.g.*, Sections 19.3.9.4.3 and 19.3.5 of IEEE 802.11 2016.

131.    The specific ways in which the Accused Products, including the 88W8997 series, are configured to support the aforementioned features of IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 14 of the '371 patent.

132.    Furthermore, the Accused Products, including the 88W8997 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 14 of the '371 patent.

133.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

134.    The claims of the '371 patent are patent eligible under 35 U.S.C. § 101. The '371 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it offers, for example, a technologically complex communication method and a radio communication apparatus that, for example, "switches between the method of transmitting modulation signals of a plurality of channels to the same frequency band from a plurality of antennas and the method of transmitting a modulation signal of one channel from an antenna." '371 patent, 4:27-31. This allows the transmitter to choose which of these transmission methods is used, based on estimated

channel conditions. The '371 patent explains that "when the communication method is used, which multiplexes modulation signals of a plurality of channels to the same frequency band, a receiver transmits the information of an estimated radio-wave propagation environment to a transmitter. The transmitter then selects a communication method based on the information. Multiplexing modulation signals of a plurality of channels to the same frequency band by using the foregoing method can increase the data transmission rate. At the same time, a radio communication apparatus of the present invention can advantageously demultiplex the multiplexed modulation signals received with ease." '371 patent, 5:4-16. That solution is reflected in, for example, claim 14 of the '371 patent.

135.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '371 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '371 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '371 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '371 patent when Redwood provided an infringement chart of the '371 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '371 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '371 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page

for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '371 patent from at least the foregoing dates that NXP USA was on notice of the '371 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[5]

136.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '371 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '371 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software,

---

[5] *See* FN 2, *supra*.

and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

137.    On information and belief, despite having knowledge of the '371 patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '371 patent. For example, Defendants specifically intended for its U.S.-based subsidiaries or customers to import and sell products accused of infringing the '371 patent. On information and belief, Defendants instructed and encouraged the importers to import and/or sell products accused of infringing the '371 patent. On information and belief, the purchase and sale agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries, affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of importing and selling products accused of infringing the '371 patent in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

138.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United

States, or importing into the United States, components of the patented invention of one or more claims of the '371 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '371 patent by making the Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '371 patent that are especially made or especially adapted for use in end user products that infringe the '371 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

139.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention of one or more claims of the '371 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented

inventions of the '371 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '371 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the  Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.,*

https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27

540.

140.    On information and belief, since at least the above-mentioned dates when NXP was

on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes

supplying or causing to be supplied in or from the United States components of the patented

invention of one or more claims of the '371 patent that are especially made or especially adapted

for use in the invention and not staple articles or commodities of commerce suitable for substantial

noninfringing use, where such components are uncombined in whole or in part, knowing that such

components are so made or adapted and intending that such components will be combined outside

of the United States in a manner that would infringe the patent if such combination occurred within

the United States. For example, NXP supplies or causes to be supplied in or from the United States

the hardware and/or software/firmware components that comprise all or a substantial portion of

the components of the patented inventions of the '371 patent, where such components are

uncombined in whole or in part, knowing that such components are especially made or especially

adapted for use in the invention and not staple articles or commodities of commerce suitable for

substantial noninfringing use and intending that such components will be combined outside of the

United States in a manner that would infringe the patent if such combination occurred within the

United States. In another example, NXP supplies or causes to be supplied in or from the United

States the hardware and/or software/firmware components that comprise all or a substantial portion

of the components of the patented inventions of the '371 patent, where such components are

uncombined in whole or in part with other components of an end user device, knowing that such

components are especially made or especially adapted for use in the invention and not staple

articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. *See, e.g.,* https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

141.    On information and belief, despite having knowledge of the '371 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '371 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '371 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

142.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V
### (INFRINGEMENT OF U.S. PATENT NO. 8,155,224)

143.    Plaintiff incorporates paragraphs 1 through 142 herein by reference.

144.    Redwood is the assignee of the '224 patent, entitled "Transmission Method, Transmission Apparatus, and Reception Apparatus," with ownership of all substantial rights in

the '224 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

145.    The '224 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '224 patent issued from U.S. Patent Application No. 12/698,917.

146.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '224 patent in this judicial district and elsewhere in Texas and the United States.

147.    NXP directly infringes the '224 patent via 35 U.S.C. § 271(a) by using and/or testing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '224 patent. As another example, NXP infringes each step of the one or more method claims of the '224 patent because the NXP Accused Products automatically, and without user modification, perform each of the claimed steps that are controlled by NXP.

148.    Furthermore, NXP NV directly infringes the '224 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '224 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '224 patent under 35 U.S.C. § 271(a) by using and/or testing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '224 patent. Further, Defendants are vicariously liable for this infringing conduct of their respective subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP

NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '224 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

149.    For example, NXP infringes claim 1 of the '224 patent via the Accused Products. The Accused Products, including the 88W8997 series, perform a method of transmitting modulation signals. *See, e.g.*, Sections 19.1.1 and 19.1.2 of IEEE 802.11 2016; https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

## 88W8997 BLOCK DIAGRAM



*Id*.

150. The Accused Products, including the 88W8997 series, each generate a plurality of modulation signals, where each modulation signal to be transmitted from a different one of a plurality of antennas, where each modulation signal includes a pilot symbol sequence consisting of a plurality of pilot symbols used for demodulation. For example, each of the Accused Products generates modulation signals (e.g., HT-mixed format PPDUs) which are to be sent to a plurality of antennas. *See, e.g.*, Section 19.3.3 of IEEE 802.11 2016. Each OFDM symbol includes a pilot symbol sequence consisting of four pilot symbols used for demodulation. *See, e.g.*, Sections 17.3.5.9 and 19.3.11.10 of IEEE 802.11 2016.

151. Each of the Accused Products, including the 88W8997 series, insert each of the pilot symbol sequences at the same temporal point in each modulation signal, wherein the pilot symbol sequences are orthogonal to each other with zero mutual correlation among the plurality of modulation signals, where each pilot symbol has a non-zero amplitude, where the quantity of the plurality of pilot symbols in each sequence being greater than the quantity of the plurality of

modulation signals to be transmitted. For example, the Accused Products insert each of the four pilot symbol sequences at the same temporal point in each modulation signal. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016. The pilot symbol sequences corresponding to different spatial streams are orthogonal and have zero mutual correlation. *See, e.g.*, Table 19-19 of IEEE 802.11 2016. The pilot symbols are BPSK modulated and have a non-zero amplitude. *See, e.g.*, Section 17.3.5.9 of IEEE 802.11 2016. Each pilot symbol sequence contains four pilot symbols, which is greater than the modulation signals to be transmitted by two or three antennas utilized by the Accused Products. *See, e.g.*, Sections 19.1.1 and 19.3.11.10 of IEEE 802.11 2016.

152.    Each of the Accused Products, including the 88W9997 series, transmit in an identical frequency band the plurality of modulation signals from the plurality of antennas, where each modulation signal comprises different transmission data and one of the pilot symbol sequences. For example, each of the Accused Products transmit the plurality of modulation signals in the same channel having a particular width (e.g., 20 MHz) from two or three antennas. *See, e.g.*, Sections 19.3.15.1, Tables 19-28, 19-29, and 19-30, and Figure 17-13 of IEEE 802.11 2016. Each stream of data is divided into multiple spatial streams by the Accused Products to form respective modulation signals comprising different transmission data during encoding. *See, e.g.*, Section 19.3.4 of IEEE 802.11 2016. Further, each of the modulation signals comprises one of the pilot symbol sequences. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016.

153.    The specific ways in which the Accused Products, including the 88W9997 series, are configured to support the aforementioned features of IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 1 of the '224 patent.

154.    Furthermore, the Accused Products, including the 88W8997 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '224 patent.

155.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

156.    The claims of the '224 patent are patent eligible under 35 U.S.C. § 101. The '224 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, the '224 patent describes a specific problem to be solved in digital signal transmission and communication involving multiplexing modulation signals of a plurality of channels to the same frequency band and its claims are directed to specific ways of solving that problem. '224 patent, 1:21-24. The patent describes that "the foregoing conventional structure gives no thought to the synchronization between channels in the same frequency band as well as a frequency offset. As a result, this structure encounters the difficulty of achieving the most important factor in order to demultiplex a multiplexed signal, namely, obtaining an accuracy of estimating channels." *Id*. at 1:53-58. "The present invention aims to provide a transmission method for estimating channels accurately and with ease from multiplexed modulation signals." *Id*. at 1:62-64.

157.    To overcome the aforementioned problems, the '224 patent and its claims describe specific solutions for transmitting multiplexed communications. "The transmission method of the present invention transmits modulation signals of a plurality of channels available in the same frequency band from a plurality of antennas. A symbol used for demodulation is inserted in a given channel at a certain time, while in another channel symbol at the time, the same phase and quadrature signals in the in-phase quadrature plane are made to be zero signals. With this method,

multiplexing the modulation signals of a plurality of channels to the same frequency allows increasing a data transmission rate. Because the symbol used for demodulation has not undergone the time multiplexing, so that the demodulation symbol can be isolated with ease at the reception apparatus." *Id.*, 2:9-21. Clam 1 recites that "each pilot symbol ha[s] a non-zero amplitude."

158.    The '224 patent and its claims describe another specific solution to overcome the aforementioned problems. "The transmission method of the present invention places the symbols used for demodulation at an identical time of the respective channels and orthogonally to each other. This preparation, i.e., the symbols used for demodulation are placed to be orthogonal to each other, allows the reception apparatus to isolate the symbols with ease for estimating channels." *Id.*, 2:28-34. This additional solution is recited by claim 1 by the steps of "inserting each of the pilot symbol sequences at the same temporal point in each modulation signal, wherein the pilot symbol sequences are orthogonal to each other." *Id.*, claim 1.

159.    The '224 patent describes a specific problem to be solved in multiplexing modulation signals from a plurality of antennas and its claims are directed to specific ways of solving that problem. That solution is further implemented in the claims, including claim 1. Therefore, the claims of '224 patent are patent eligible. In addition, the claims of the '224 Patent are directed to solving problems that solely arise in computer technology (digital signal communication and transmission) via a specific improvement to its operation. For example, the claims are directed to a specific improvement in wireless systems as to multiplexing modulation signals of a plurality of channels to the same frequency band. As such, they are not patent ineligible abstract ideas.

160.    The claims also survive step two of Alice because they recite an inventive concept that provides features that are more than well-understood, routine, conventional activity. *See e.g.,* '224 patent, claim 1, 1:53-64, 2:9-21, 2:28-34.

161.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '224 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '224 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '224 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '224 patent when Redwood provided an infringement chart of the '224 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '224 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '224 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/;                                 and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '224 patent from at least the foregoing dates that NXP USA was

on notice of the '224 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[6]

162.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '224 patent by testing and/or using the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '224 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the  Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products that are then used and/or tested by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-

---

[6] *See* FN 2, *supra*.

marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

163.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United States, or importing into the United States, components of the patented invention of one or more claims of the '224 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '224 patent by making the NXP Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '224 patent that are especially made or especially adapted for use in end user products that infringe the '224 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

164.    On information and belief, despite having knowledge of the '224 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '224 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high

likelihood of infringement. NXP's infringing activities relative to the '224 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

165.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT VI**

(INFRINGEMENT OF U.S. PATENT NO. 8,744,005)

166.    Plaintiff incorporates paragraphs 1 through 165 herein by reference.

167.    Redwood is the assignee of the '005 patent, entitled "Method and Apparatus for Generating Modulation Signals," with ownership of all substantial rights in the '005 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

168.    The '005 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '005 patent issued from U.S. Patent Application No. 14/019,346.

169.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '005 patent in this judicial district and elsewhere in Texas and the United States.

170.    NXP directly infringes the '005 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes,

and/or products containing the same that incorporate the fundamental technologies covered by the '005 patent.

171.    Furthermore, NXP NV directly infringes the '005 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '005 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '005 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '005 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '005 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

172.    For example, NXP infringes claim 9 of the '005 patent via the Accused Products, including the 88W8997 series. The Accused Products, including the 88W8997 series, are each a signal generation apparatus configured to generate modulation signals. For example, the Accused Products are each compliant with IEEE 802.11n, which specifies generating modulation signals. *See, e.g.*, Sections 19.1.1 and 19.1.2 of IEEE 802.11 2016; https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

### 88W8997 BLOCK DIAGRAM



*Id*.

173.    The Accused Products, including the 88W8997 series, comprise one or more processing devices configured to generate a plurality of modulation signals each of which is to be transmitted from a different one of a plurality of antennas in an identical frequency band, wherein each modulation signal includes a pilot symbol sequence each comprising a plurality of pilot symbols used for demodulation. For example, the Accused Products generate modulation signals, e.g., HT-mixed format PPDUs, which are to be transmitted from a different one of a plurality of antennas in an identical frequency band (e.g., a 20 MHz channel). *See, e.g.*, Sections 19.3.3,

19.3.15, 19.3.14.1, Tables 19-28, 19-29, 19-30, and Figure 17-13 of IEEE 802.11 2016. Each OFDM symbol within a modulation signal includes a pilot symbol sequence of four pilot symbols, which are used for detecting frequency offsets and phase noise for demodulation. *See, e.g.*, Sections 17.3.5.9 and 19.3.11.10 of IEEE 802.11 2016.

174.    The Accused Products, including the 88W8997 series, comprise one or more processing devices configured to insert each of the pilot symbol sequences at the same temporal point in each modulation signal. For example, each modulation signal is made up of OFDM symbols containing a pilot symbol sequence inserted at the same temporal point in each modulation signal, where the modulation signals to be sent from different antennas are transmitted simultaneously in time. *See, e.g.*, Section 19.3.11.10 and Equation 19-54 of IEEE 802.11 2016.

175.    The Accused Products, including the 88W8997 series, comprise one or more processing devices configured to output the plurality of modulation signals, each comprising different transmission data and one of the pilot symbol sequences, to the plurality of antennas. For example, the Accused Products divide a stream of data to be transmitted into multiple spatial streams to form respective modulation signals during the encoding and mapping process, where the divided data is then sent to a plurality of antennas. *See, e.g.*, Section 19.3.4 of IEEE 802.11 2016. Each divided stream of data includes one of the pilot symbol sequences. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016.

176.    The pilot symbol sequences are orthogonal to each other with zero mutual correlation among the plurality of modulation signals. For example, the pilot sequences corresponding to different spatial streams are orthogonal and have zero mutual correlation, such that the dot product of the two vectors is zero and the vectors are perpendicular in space. *See, e.g.*, Table 19-19 19.1.1 of IEEE 802.11 2016.

177.    Each pilot symbol has a non-zero amplitude. For example, the pilot symbols are BPSK modulated and have a non-zero amplitude. *See, e.g.*, Section 17.3.5.9 of IEEE 802.11 2016.

178.    A quantity of the plurality of pilot symbols in each sequence are greater than a quantity of the plurality of modulation signals to be transmitted. For example, each pilot symbol sequence contains four pilot symbols. Therefore, when the modulation signals are to be transmitted using fewer than four antennas, the number of pilot symbols per sequence is greater than the number of modulation signals to be transmitted. *See, e.g.*, Sections 19.1.1, 19.3.11.10, and Equation 19-54 of IEEE 802.11 2016.

179.    The specific ways in which the Accused Products, including the 88W8997 series, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 9 of the '005 patent.

180.    Furthermore, the Accused Products, including the 88W8997 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 9 of the '005 patent.

181.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

182.    The claims of the '005 patent are patent eligible under 35 U.S.C. § 101. The '005 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, the '005 patent describes a specific problem to be solved in digital signal transmission and communication involving multiplexing modulation signals of a plurality of channels to the same frequency band and its claims are directed to specific ways of solving that problem. '005 patent, 1:23-26. The

74

patent describes that "the foregoing conventional structure gives no thought to the synchronization between channels in the same frequency band as well as a frequency offset. As a result, this structure encounters the difficulty of achieving the most important factor in order to demultiplex a multiplexed signal, namely, obtaining an accuracy of estimating channels." *Id.* at 1:56-61. "The present invention aims to provide a transmission method for estimating channels accurately and with ease from multiplexed modulation signals." *Id.* at 1:65-67.

183.    To overcome the aforementioned problems, the '005 patent and its claims describe specific solutions for transmitting multiplexed communications. "The transmission method of the present invention transmits modulation signals of a plurality of channels available in the same frequency band from a plurality of antennas. A symbol used for demodulation is inserted in a given channel at a certain time, while in another channel symbol at the time, the same phase and quadrature signals in the in-phase quadrature plane are made to be zero signals. With this method, multiplexing the modulation signals of a plurality of channels to the same frequency allows increasing a data transmission rate. Because the symbol used for demodulation has not undergone the time multiplexing, so that the demodulation symbol can be isolated with ease at the reception apparatus." *Id.*, 2:12-24. Clam 9 recites that "each pilot symbol ha[s] a non-zero amplitude."

184.    The '005 patent and its claims describe another specific solution to overcome the aforementioned problems. "The transmission method of the present invention places the symbols used for demodulation at an identical time of the respective channels and orthogonally to each other. This preparation, i.e., the symbols used for demodulation are placed to be orthogonal to each other, allows the reception apparatus to isolate the symbols with ease for estimating channels." *Id.*, 2:31-37. This additional solution is recited by claim 9 by the steps of "insert each of the pilot

symbol sequences at the same temporal point in each modulation signal …, wherein the pilot symbol sequences are orthogonal to each other." *Id*., claim 9.

185.    The '005 patent describes a specific problem to be solved in multiplexing modulation signals to be sent from a plurality of antennas and its claims are directed to specific ways of solving that problem. That solution is further implemented in the claims, including claim 9. Therefore, the claims of '005 patent are patent eligible. In addition, the claims of the '005 Patent are directed to solving problems that solely arise in computer technology (digital signal communication and transmission) via a specific improvement to its operation. For example, the claims are directed to a specific improvement in wireless systems as to multiplexing modulation signals of a plurality of channels to the same frequency band. As such, they are not patent ineligible abstract ideas.

186.    The claims also survive step two of Alice because they recite an inventive concept that provides features that are more than well-understood, routine, conventional activity. *See e.g.*, '005 patent, claim 9, 1:56-67, 2:12-24, 2:31-37.

187.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '005 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '005 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '005 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '005 patent when Redwood provided an infringement chart of the '005 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '005 patent provided by

Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '005 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '005 patent from at least the foregoing dates that NXP USA was on notice of the '005 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[7]

188.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '005 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '005 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or

---

[7] *See* FN 2, *supra*.

maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

189.    On information and belief, despite having knowledge of the '005 patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '005 patent. For example, Defendants specifically intended for its U.S.-based subsidiaries or customers to import and sell products accused of infringing the '005 patent. On information and belief, Defendants instructed and encouraged the importers to import and/or sell products accused of infringing the '005 patent. On information and belief, the purchase and sale agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries, affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of importing and selling products accused of infringing the '005 patent in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27
540.

190.    On information and belief, since at least the above-mentioned dates when NXP was
on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c)
includes offering to sell and/or license, selling and/or licensing, and/or providing within the United
States, or importing into the United States, components of the patented invention of one or more
claims of the '005 patent, constituting a material part of the invention. On information and belief,
NXP knows and has known the same to be especially made or especially adapted for use in an
infringement of the '005 patent by making the Accused Products in conformity with the relevant
IEEE 802.11 standards, and such components are not a staple article or commodity of commerce
suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses
or otherwise provides hardware and/or software/firmware components of the Accused Products
within the United States; the components constitute a material part of the claimed inventions of
the '005 patent that are especially made or especially adapted for use in end user products that
infringe the '005 patent; and the components are not a staple article or commodity of commerce
suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-
center/partner-marketplace:PARTNER-MARKETPLACE;
https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27
540.

191.    On information and belief, since at least the above-mentioned dates when NXP was
on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes
supplying or causing to be supplied in or from the United States all or a substantial portion of the
components of the patented invention of one or more claims of the '005 patent, where such

components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '005 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '005 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or

software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

192.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes supplying or causing to be supplied in or from the United States components of the patented invention of one or more claims of the '005 patent that are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '005 patent, where such components are uncombined in whole or in part, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the

United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '005 patent, where such components are uncombined in whole or in part with other components of an end user device, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

193.    On information and belief, despite having knowledge of the '005 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '005 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '005 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

194.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood

for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII
### (INFRINGEMENT OF U.S. PATENT NO. 8,873,517)

195.    Plaintiff incorporates paragraphs 1 through 194 herein by reference.

196.    Redwood is the assignee of the '517 patent, entitled "Wireless Communication System, Wireless Communication Apparatus, Wireless Communication Method and Computer Program," with ownership of all substantial rights in the '517 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

197.    The '517 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '517 patent issued from U.S. Patent Application No. 11/333,582.

198.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '517 patent in this judicial district and elsewhere in Texas and the United States.

199.    NXP directly infringes the '517 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '517 patent.

200.    Furthermore, NXP NV directly infringes the '517 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP BV directly infringes the '517 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '517 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or

products containing the same that incorporated the fundamental technologies covered by the '517 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '517 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

201.    For example, NXP infringes claim 1 of the '517 patent via the Accused Products, including the W8987 series. The Accused Products, including the W8987 series, are mesh stations compliant with IEEE 802.11s in a wireless communication system using a signal described in IEEE 802.11. *See, e.g.*, Sections 14.3.2 and 14.13.2.1 of IEEE 802.11 2016; https://site.eettaiwan.com/webinar/pdf/NXP_Live_Webinar_20210202.pdf, NXP Wi-Fi/BT Introduction (February 2021) at p. 21 (NXP advertising that the W8987 series of products are compliant with IEEE 802.11s); and https://www.nxp.com/products/wireless-connectivity/wi-fi-plus-bluetooth-plus-802-15-4/88w8987-automotive-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-

plus-bluetooth-5-2-solution:88W8987A (NXP advertising that the 88W8987 features include Wi-Fi Stations and/or Access Point).

202.    The Accused Products, including the W8987 series, each comprise circuitry configured to set a duration of transmission opportunity and an offset of the transmission opportunity indicating a beginning of the transmission opportunity with respect to a beginning of a transmission interval. For example, the Accused Products, including the W8987 series, comprise circuitry configured to set a duration of a transmission opportunity via a Mesh Awake Window, which specifies the duration of a transmission opportunity. *See, e.g.*, Figure 14-6 of IEEE 802.11 2016. The Accused Products comprise circuitry configured to perform a Target Beacon Transmission Time ("TBTT") adjustment procedure, subtracting a delay amount as an offset from the TBTT, which indicates a beginning of the Mesh Awake Windows. *See, e.g.,* Section 14.13.4.4.3 and Figure 14-6 of IEEE 802.11 2016. The adjusted TBTT indicates a beginning of the Mesh Awake Window with respect to the beginning of a Beacon Interval. *See, e.g.,* Section 14.13.4.4.3 and Figure 14-6 of IEEE 802.11 2016.

203.    The Accused Products, including the W8987 series, each comprise circuitry configured to transmit information specifying the duration and the offset to at least one or more other mesh stations. For example, the Accused Products are configured to transmit Mesh Beacons specifying the duration and the offset to at least one or more other mesh stations. *See, e.g.*, Sections 9.4.2.105, 14.13.4.2.5, 14.13.3.1, and 14.13.4.4.3 of IEEE 802.11 2016.

204.    The Accused Products, including the W8987 series, each comprise circuitry configured to transmit or receive data during the transmission opportunity. For example, the Accused Products are configured to transmit or receive data during the Mesh Awake Window. *See, e.g.*, Section 14.14.4.7 and Figure 14-6 of IEEE 802.11 2016.

205.    The specific ways in which the Accused Products, including the W8987 series, are configured to support the aforementioned features of IEEE 802.11 2016 are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 1 of the '517 patent.

206.    Furthermore, the Accused Products, including the W8987 series, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '517 patent.

207.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

208.    The claims of the '517 patent are patent eligible under 35 U.S.C. § 101. The '517 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, the '517 patent describes a specific problem to be solved in signal transmission and communication, and its claims are directed to specific ways of solving that problem. The '517 patent is eligible because it is directed to a non-abstract improvement in an existing technological process. Indeed, the '517 patent is directed to improving the efficiency of a wireless network by setting durations and transmission opportunities to evade mutual interference among communication stations within a mesh network. *See, e.g.*,'517 patent, 1:40-46) (the '517 patent enables a "communication station[s] to evade mutual interference").

209.    For example, the claims of the '517 patent provide a specific solution of evading mutual interference by setting durations and periodicities of transmission opportunities. As the '517 patent explains, these limitations effectively shift beacon transmission times away from each other to evade overlapping transmissions among communication stations, thus advancing the goal

of evading interference. *See, e.g.*, '517 patent, 21:50-60 ("By providing the TBTT offset, actual beacon transmission times can be shifted from each other even in a case where two communication stations arrange their beacon transmission timing in the same slot on a super frame."). Accordingly, claim 1 does not cover an abstract idea but instead covers a patentable improvement in signal transmission. *See, e.g., Id*., claim 1 ("set a duration of transmission opportunity and an offset of the transmit opportunity indicating a beginning of the transmission opportunity with respect to a beginning of a transmission interval."). In addition, the claims of the '517 patent are directed to solving problems, e.g., signal interference, that solely arise in computer technology (digital signal communication and transmission) via a specific improvement in its operation, e.g., shifting beacon transmission times away from each other to evade overlapping transmissions among communication stations. As such, they are not patent ineligible abstract ideas.

210.    The claims of the '517 patent also survive step two of Alice because they recite an inventive concept that provides features that are more than well-understood, routine, conventional activity. As explained above, the claims shift beacon transmission times away from each other to evade overlapping transmissions among communication stations, thus advancing the goal of evading interference. The claims are directed to the technical solutions described in the specification. *See, e.g.*, '517 patent, claim 1, 1:40-46, 21:50-60.

211.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '517 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '517 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '517 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 28, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '517 patent when Redwood

provided an infringement chart of the '517 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '517 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '517 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/; and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and NXP BV were on notice of the '517 patent from at least the foregoing dates that NXP USA was on notice of the '517 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[8]

212.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '517 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '517 patent. NXP intends to cause, and has taken

---

[8] *See* FN 2, *supra*.

affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

213.     On information and belief, despite having knowledge of the '517 patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '517 patent. For example, Defendants specifically intended for its U.S.-based subsidiaries or customers to import and sell products accused of infringing the '517 patent. On information and belief, Defendants instructed and encouraged the importers to import and/or sell products accused of infringing the '517 patent. On information and belief, the purchase and sale agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries,

affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of importing and selling products accused of infringing the '517 patent in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

214.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c) includes offering to sell and/or license, selling and/or licensing, and/or providing within the United States, or importing into the United States, components of the patented invention of one or more claims of the '517 patent, constituting a material part of the invention. On information and belief, NXP knows and has known the same to be especially made or especially adapted for use in an infringement of the '517 patent by making the Accused Products in conformity with the relevant IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '517 patent that are especially made or especially adapted for use in end user products that infringe the '517 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

215.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention of one or more claims of the '517 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '517 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '517 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing

the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

216.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes supplying or causing to be supplied in or from the United States components of the patented invention of one or more claims of the '517 patent that are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '517 patent, where such components are

uncombined in whole or in part, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '517 patent, where such components are uncombined in whole or in part with other components of an end user device, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27540.

217.    On information and belief, despite having knowledge of the '517 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '517 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '517 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such

that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

218.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VIII
### (INFRINGEMENT OF U.S. PATENT NO. 9,628,300)

219.    Plaintiff incorporates paragraphs 1 through 218 herein by reference.

220.    Redwood is the assignee of the '300 patent, entitled "Method and Signal Generating Apparatus for Generating Modulation Signals" with ownership of all substantial rights in the '300 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

221.    The '300 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '300 patent issued from U.S. Patent Application No. 14/591,346.

222.    NXP has and continues to directly and/or indirectly infringe one or more claims of the '300 patent in this judicial district and elsewhere in Texas and the United States.

223.    NXP directly infringes the '300 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '300 patent.

224.    Furthermore, NXP NV directly infringes the '300 patent through its direct involvement in the activities of its subsidiaries, including NXP BV and NXP USA. Similarly, NXP

BV directly infringes the '300 patent through its direct involvement in the activities of its subsidiaries, including NXP USA. Such subsidiaries conduct activities that constitute direct infringement of the '300 patent under 35 U.S.C. § 271(a) by making, using, testing, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporated the fundamental technologies covered by the '300 patent. Further, Defendants are vicariously liable for this infringing conduct of its subsidiaries (under both the alter ego and agency theories) because, as an example and on information and belief, NXP NV, NXP BV, and NXP USA, and their subsidiaries and related companies are essentially the same company, and NXP NV and/or NXP BV have the right and ability to control their subsidiaries infringing acts and receive a direct financial benefit from the infringement of its subsidiaries. Furthermore, on information and belief, NXP sells and makes the Accused Products outside of the United States, delivers those products to manufacturers, customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products or products that are manufactured to include NXP's Accused Products are destined for the United States and/or designing those products for inclusion in other products to be placed on sale and used in the United States, thereby directly infringing the '300 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

225.     For example, NXP infringes claim 8 of the '300 patent via the Accused Products, including the 88W8997 series. Each of the Accused Products are a signal generation apparatus configured to generate signals. *See, e.g.*, Sections 19.1.1 and 19.1.2 of IEEE 802.11 2016; https://www.nxp.com/docs/en/fact-sheet/88W8997-FACT-SHEET.pdf.

**88W8997 BLOCK DIAGRAM**



*Id.*

226.    The Accused Products, including the 88W8997 series, each comprise one or more processing devices configured to generate a plurality of modulation signals each of which is to be transmitted from a different one of a plurality of antennas. For example, each of the Accused Products generate modulation signals (e.g., HT-mixed format PPDUs) which are to be transmitted from a plurality of antennas. *See, e.g.*, Section 9.3.3 of IEEE 802.11 2016. Each modulation signal includes a pilot symbol sequence and/or a pilot subcarrier including a plurality of pilot symbols used for demodulation. For example, each OFDM symbol within a modulation signal includes a pilot symbol sequence, in a 20 MHz transmission, of four pilot symbols located at carrier positions -21, -7, 7, and 21, or a pilot symbol sequence, in a 40 MHz transmission, of six pilot symbols, where the pilot symbols are used for demodulation for detecting frequency offsets and phase noise. *See, e.g.*, Sections 17.3.5.9, 19.3.11.10, and Equation 19-54 of IEEE 802.11 2016.

227.    Each of the Accused Products comprise one or more processing devices configured to insert each of the pilot symbol sequences and/or pilot subcarriers at a same temporal point in

each modulation signal. For example, each of the modulation signals is comprised of pilot symbol sequences that include at least four pilot symbols inserted in, for example, carrier positions -21, -7, 7, and 21, such that each modulation signal and respective pilot symbol sequence are inserted and transmitted simultaneously in time. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016. The pilot symbol sequences and/or pilot subcarriers are orthogonal to each other, where each pilot symbol has a non-zero amplitude. For example, the pilot sequences corresponding to different spatial streams are orthogonal to each other and have zero mutual correlation. *See, e.g.*, Table 19-19 of IEEE 802.11 2016. A quantity of the plurality of pilot symbols in each pilot symbol sequence and/or pilot subcarrier are greater than a quantity of the plurality of modulation signals to be transmitted. As previously discussed, each pilot symbol sequence contains at least four pilot symbols in a 20 MHz transmission and at least six pilot symbols in a 40 MHz transmission, such that these quantities are greater than a respective number of modulation signals to be transmitted by the Accused Products. *See, e.g.*, Sections 19.1.1, 19.3.11.10 and Equation 19-54 of IEEE 802.11 2016.

228.    Each of the Accused Products comprise one or more processing devices configured to output the plurality of modulation signals, each including different transmission data and one of the pilot symbol sequences and/or pilot subcarriers, to the plurality of antennas. For example, each of the modulation signals is transmitted to at least two antennas, such that each of the modulation signals include different transmission data. *See, e.g.*, Section 19.3.15.1, Tables 19-28, 19-29, and 19-30, and Figure 17-13 of IEEE 802.11 2016.

229.    As previously discussed, each of the plurality of modulation signals contains one of the pilot symbol sequences and/or pilot subcarriers. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016.

230.    Furthermore, the Accused Products are configured or implemented in an infringing manner with the features and functionality recited in at least claim 8 of the '300 patent.

231.    The specific ways in which the Accused Products are configured to support the aforementioned features of IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least claim 8 of the '300 patent.

232.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

233.    The claims of the '300 patent are patent eligible under 35 U.S.C. § 101. The '300 patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, the '300 patent describes a specific problem to be solved in digital signal transmission and communication involving multiplexing modulation signals of a plurality of channels and its claims are directed to specific ways of solving that problem. '300 patent, 1:26-29. The patent describes that "the foregoing conventional structure gives no thought to the synchronization between channels in the same frequency band as well as a frequency offset. As a result, this structure encounters the difficulty of achieving the most important factor in order to demultiplex a multiplexed signal, namely, obtaining an accuracy of estimating channels." *Id*. at 1:56-62. "The present invention aims to provide a transmission method for estimating channels accurately and with ease from multiplexed modulation signals." *Id*. at 1:66-2:1.

234.    To overcome the aforementioned problems, the '300 patent and its claims describe specific solutions for transmitting multiplexed communications. "The transmission method of the present invention transmits modulation signals of a plurality of channels available in the same

frequency band from a plurality of antennas. A symbol used for demodulation is inserted in a given channel at a certain time, while in another channel symbol at the time, the same phase and quadrature signals in the in-phase quadrature plane are made to be zero signals. With this method, multiplexing the modulation signals of a plurality of channels to the same frequency allows increasing a data transmission rate. Because the symbol used for demodulation has not undergone the time multiplexing, so that the demodulation symbol can be isolated with ease at the reception apparatus." *Id*., 2:14-27. Clam 8 recites that "each pilot symbol ha[s] a non-zero amplitude."

235.    The '300 patent and its claims describe another specific solution to overcome the aforementioned problems. "The transmission method of the present invention places the symbols used for demodulation at an identical time of the respective channels and orthogonally to each other. This preparation, i.e., the symbols used for demodulation are placed to be orthogonal to each other, allows the reception apparatus to isolate the symbols with ease for estimating channels." *Id*., 2:34-40. This additional solution is recited by claim 8, where the one or more processing devices are configured to  "insert each of the pilot symbol sequences and/or pilot subcarriers at a same temporal point in each modulation signal …, wherein the pilot symbol sequences and/or pilot subcarriers are orthogonal to each other." *Id*., claim 1.

236.    The '300 patent describes a specific problem to be solved in multiplexing modulation signals to be transmitted from a plurality of antennas and its claims are directed to specific ways of solving that problem. That solution is further implemented in the claims, including claim 8. Therefore, the claims of '300 patent are patent eligible. In addition, the claims of the '300 patent are directed to solving problems that solely arise in computer technology (digital signal communication and transmission) via a specific improvement to its operation. For example, the claims are directed to a specific improvement in wireless systems as to multiplexing modulation

signals of a plurality of channels to the same frequency band. As such, they are not patent ineligible abstract ideas.

237.    The claims also survive step two of Alice because they recite an inventive concept that provides features that are more than well-understood, routine, conventional activity. *See e.g.,* '300 patent, claim 8, 1:56-2:1, 2:14-27, 2:34-40.

238.    At a minimum, NXP NV, NXP BV, and NXP USA have known of the '300 patent at least as early as the filing date of the Complaint. In addition, NXP NV, NXP BV, and NXP USA have known about the '300 patent since at least November 8, 2021, when NXP NV and NXP USA received notice of their infringement of the '300 patent via a letter, and at least by November 20, 2021 when an agent for NXP USA replied to the letter. On January 24, 2022, NXP NV, NXP BV, and NXP USA received further notice of their infringement of the '300 patent when Redwood provided an infringement chart of the '300 patent to an agent for NXP USA via a data room accessible by NXP. An agent for NXP USA stated that it was refusing to access or review documents provided by Redwood, including the infringement chart of the '300 patent provided by Redwood via the data room. Furthermore, NXP NV, NXP BV, and NXP USA have known about the '300 patent since at least May 12, 2022, when an agent for NXP USA received further notice of their infringement via email. Indeed, the agent for NXP USA, Mikhail Lotvin, who received the aforementioned notices also identifies as an agent for NXP NV, where his LinkedIn profile identifies his role as Senior Counsel at NXP Semiconductors since 2012 and the LinkedIn page for NXP Semiconductors identifies itself as NXP Semiconductors N.V. *See* https://www.linkedin.com/in/mikhail-lotvin-42804626/;                    and https://www.linkedin.com/company/nxp-semiconductors/. On information and belief, NXP USA is an agent and alter ego of NXP NV and NXP BV. Based on information and belief, NXP NV and

NXP BV were on notice of the '300 patent from at least the foregoing dates that NXP USA was on notice of the '300 patent as a result of receiving actual or constructive notice from NXP USA, which is owned and controlled by its parents NXP NV and NXP BV.[9]

239.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers to directly infringe one or more claims of the '300 patent by making, using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, NXP does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '300 patent. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, end users, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, manufacturing the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals for the Accused Products to purchasers and prospective buyers, providing the accused functionalities via hardware, software, and/or firmware that are included in the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.,*

---

[9] *See* FN 2, *supra.*

https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27

540.

240.    On information and belief, despite having knowledge of the '300 patent and their

infringement, Defendants specifically intended for others to import and sell products accused of

infringing the '300 patent. For example, Defendants specifically intended for its U.S.-based

subsidiaries or customers to import and sell products accused of infringing the '300 patent. On

information and belief, Defendants instructed and encouraged the importers to import and/or sell

products accused of infringing the '300 patent. On information and belief, the purchase and sale

agreements between NXP NV, NXP BV, and NXP USA and the importers provide such instruction

and/or encouragement. Further, on information and belief, Defendants' U.S.-based subsidiaries,

affiliates, employees, agents, and/or related companies existed for inter alia, the purpose of

importing and selling products accused of infringing the '300 patent in the United States. *See, e.g.*,

https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27

540.

241.    On information and belief, since at least the above-mentioned dates when NXP was

on notice of its infringement, NXP's contributory infringement pursuant to 35 U.S.C. § 271(c)

includes offering to sell and/or license, selling and/or licensing, and/or providing within the United

States, or importing into the United States, components of the patented invention of one or more

claims of the '300 patent, constituting a material part of the invention. On information and belief,

NXP knows and has known the same to be especially made or especially adapted for use in an

infringement of the '300 patent by making the Accused Products in conformity with the relevant

IEEE 802.11 standards, and such components are not a staple article or commodity of commerce suitable for substantial noninfringing use. For example, NXP offers to sell, sells, and/or licenses or otherwise provides hardware and/or software/firmware components of the Accused Products within the United States; the components constitute a material part of the claimed inventions of the '300 patent that are especially made or especially adapted for use in end user products that infringe the '300 patent; and the components are not a staple article or commodity of commerce suitable for substantial noninfringing use. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

242.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(1) includes supplying or causing to be supplied in or from the United States all or a substantial portion of the components of the patented invention of one or more claims of the '300 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused Products that comprise all or a substantial portion of the components of the patented inventions of the '300 patent, where NXP actively induces the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components of the Accused

Products that comprise all or a substantial portion of the components of the patented inventions of the '300 patent, where NXP actively induces the combination of the hardware and/or software/firmware components with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. NXP intends to cause, and has taken affirmative steps to induce infringement by distributors, customers, subsidiaries, importers, partners, affiliates, resellers, manufacturers, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining and/or knowledge of established distribution channels for the  Accused Products into and within the United States, manufacturing the components of the Accused Products in conformity with U.S. laws and regulations, manufacturing the components of the Accused Products in conformity with the relevant IEEE 802.11 standards, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and software/firmware components, distributing or making available instructions or manuals or marketing materials regarding the combination of the hardware and/or software/firmware components with other components as part of making an end user device in part or in whole, testing and certifying features related to infringing features in the Accused Products, providing software and/or firmware for the Accused Products to manufacturers, purchasers, sellers, distributors, and/or end users, and/or providing technical support, replacement parts, or services for these products to these purchasers and/or sellers in the United States. *See, e.g.*, https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE; https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27 540.

243.    On information and belief, since at least the above-mentioned dates when NXP was on notice of its infringement, NXP's infringement pursuant to 35 U.S.C. § 271(f)(2) includes supplying or causing to be supplied in or from the United States components of the patented invention of one or more claims of the '300 patent that are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. For example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '300 patent, where such components are uncombined in whole or in part, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. In another example, NXP supplies or causes to be supplied in or from the United States the hardware and/or software/firmware components that comprise all or a substantial portion of the components of the patented inventions of the '300 patent, where such components are uncombined in whole or in part with other components of an end user device, knowing that such components are especially made or especially adapted for use in the invention and not staple articles or commodities of commerce suitable for substantial noninfringing use and intending that such components will be combined with other components of an end user device outside of the United States in a manner that would infringe the patent if such combination occurred within the

United     States.     *See,*     *e.g.*,     https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27

540.

244.    On information and belief, despite having knowledge of the '300 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '300 patent, NXP has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '300 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found     or     assessed.     *See,*     *e.g.*,     https://www.nxp.com/design/design-center/partner-marketplace:PARTNER-MARKETPLACE;

https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=14080&offeringId=27

540.

245.    Redwood has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to Redwood in an amount that adequately compensates Redwood for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## **CONCLUSION**

246.    Plaintiff Redwood is entitled to recover from NXP the damages sustained by Plaintiff as a result of NXP's wrongful acts, and willful infringement, in an amount subject to proof

at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

247.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

248.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

249.    Plaintiff respectfully requests that the Court find in its favor and against NXP, and that the Court grant Plaintiff the following relief:

1.  A judgment that NXP has infringed the Asserted Patents as alleged herein, directly and/or indirectly;

2.  A judgment for an accounting of all damages sustained by Plaintiff as a result of the acts of infringement by NXP;

3.  A judgment and order requiring NXP to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

4.  A judgment and order requiring NXP to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

5. A judgment and order finding this to be an exceptional case and requiring NXP to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

6. Such other and further relief as the Court deems just and equitable.

Dated: March 8, 2024

Respectfully submitted,

/s/ *Patrick J. Conroy*
Patrick J. Conroy
Texas Bar No. 24012448
T. William Kennedy Jr.
Texas Bar No. 24055771
Jon Rastegar
Texas Bar No. 24064043
**Nelson Bumgardner Conroy PC**
2727 N. Harwood St.
Suite 250
Dallas, TX 75201
Tel: (214) 446-4950
pat@nelbum.com
bill@nelbum.com
jon@nelbum.com

John P. Murphy
Texas Bar No. 24056024
**Nelson Bumgardner Conroy PC**
3131 W 7th St
Suite 300
Fort Worth, TX 76107
Tel: (817) 377-9111
murphy@nelbum.com

**Attorneys for Plaintiff**
**Redwood Technologies, LLC**